Approved: _____
KRISTY J. GREENBERG
Assistant United States Attorney

Before:   HONORABLE KEVIN NATHANIEL FOX
          United States Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - - - - x
                                 :   SEALED COMPLAINT
UNITED STATES OF AMERICA         :
                                 :   Violations of
       - v. -                    :   18 U.S.C. §§ 1343 & 2
                                 :
WILLIAM McFARLAND,               :   COUNTY OF OFFENSE:
                                 :   NEW YORK
              Defendant.         :
                                 :
- - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

      BRANDON RACZ, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation (the "FBI"), and charges as follows:

Count One

(Wire Fraud)

      1. From at least in or about late 2016, up to and including in or about May 2017, in the Southern District of New York and elsewhere, WILLIAM McFARLAND, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, McFARLAND engaged in a scheme to induce others to make financial investments in Fyre Media LLC ("Fyre Media"), a digital media company controlled and operated by McFARLAND, by, among other things, making false representations about Fyre Media's revenue and McFARLAND's own finances, and in connection therewith and in

1

furtherance thereof, McFARLAND caused wire communications and wire transfers of funds to be sent in interstate commerce.

(Title 18, United States Code, Sections 1343 & 2.)

The bases for my knowledge and for the foregoing charge are, in part and among other things, as follows:

2. I am a Special Agent with the Federal Bureau of Investigation ("FBI"). I have been an FBI Special Agent for approximately two years and I am assigned to a White Collar Fraud squad within the New York Division. As part of my work at the FBI, I have received training regarding fraud and white collar crimes. I am familiar with the facts and circumstances set forth below from my personal participation in the investigation, including my examination of reports and records, interviews I have conducted, and conversations with other law enforcement officers and other individuals. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, unless noted otherwise.

## THE DEFENDANT AND HIS COMPANY

3. At all times relevant to this Complaint, WILLIAM McFARLAND, the defendant, was the founder and Chief Executive Officer of Fyre Media. In 2016, McFARLAND started Fyre Media to build a digital app that would allow individuals organizing commercial events, such as concerts, to bid for artist and celebrity bookings at such events. According to Fyre Media documents provided to investors by McFARLAND, Fyre Media's historical and projected revenue from at least April 2016 to November 2017 consisted solely of artist bookings.

4. In late 2016, WILLIAM McFARLAND, the defendant, established a subsidiary of Fyre Media known as Fyre Festival LLC and began promoting a music festival set to take place over two weekends in the Bahamas (the "Fyre Festival"). McFARLAND promoted the Fyre Festival in part by claiming that it would bring a global audience together to share a life changing experience. Ultimately, the Fyre Festival was widely deemed to have been a failure.

**OVERVIEW OF THE SCHEME TO DEFRAUD**

5.      As set forth below, WILLIAM McFARLAND, the defendant, perpetrated a scheme to defraud individuals by inducing at least two investors to invest approximately $1.2 million dollars in Fyre Media and Fyre Festival LLC based upon misrepresentations about Fyre Media's revenue and income.  In furtherance of the scheme McFARLAND provided to investors material information that was false.  For example, contrary to representations to investors by McFARLAND that Fyre Media earned millions of dollars of revenue from at least July 2016 until April 2017, a review of Fyre Media's records shows that, during that same timeframe, Fyre Media earned significantly less revenue.  Furthermore, in order to induce at least one investor to make an investment in Fyre Media, McFARLAND provided an altered stock ownership statement to inflate the number of shares he purportedly owned, so it would appear that McFARLAND could personally guarantee the investment.

**MCFARLAND'S MISREPRESENTATIONS TO VICTIM-INVESTORS
ABOUT FYRE MEDIA'S REVENUE**

6.      From speaking with two individuals ("Victim-1" and "Victim-2") who invested in Fyre Media and Fyre Festival LLC based in part upon misrepresentations by WILLIAM McFARLAND, the defendant, and reviewing documents provided by Victim-1 and Victim-2, I have learned, in substance and in part, the following:

**Victim-1**

a.      From in or about February 2017, up to and including in or about April 2017, Victim-1 made a series of investments in Fyre Media and Fyre Festival LLC totaling approximately $700,000.  On one occasion on February 14, 2017, Victim-1, who was in London, England, wired an investment of $200,000 to a Fyre Media bank account in New York, New York.

b.      Victim-1 was first introduced to McFARLAND in or about early 2017.  McFARLAND told Victim-1 that McFARLAND wanted to raise capital for Fyre Media.  On or about February 8, 2017, McFARLAND emailed Victim-1 a Private Placement Memorandum (the "Memorandum") concerning Fyre Media and the Fyre Festival.

      c.   According to the Memorandum, "[s]ince launching in May 2016, thousands of offers representing tens of millions of dollars of performances and appearances have been made and accepted with Fyre."

      d.   The Memorandum also provides Fyre Media's purported financials in an appendix consisting of a statement detailing Fyre Media's income from April through December 2016, and the projected income from January through November 2017 (the "Fyre Media Income Statement"). The Fyre Media Income Statement shows millions in revenue derived solely from thousands of artist bookings. McFARLAND confirmed to Victim-1 that the numbers reflected in the Fyre Media Income Statement were accurate.

      e.   On or about April 24, 2017, Victim-1 asked McFARLAND to send "the latest on bookings," to which McFARLAND replied, "$44 for march and April will be just under $50!" Victim-1 understood McFARLAND to be referring to 44 million dollars and 50 million dollars, respectively, in revenue from bookings with Fyre Media. Victim-1 asked again for "any break down details. Maybe by artist or something like that. It's a mind boggling number per month and u have not started fully marketing yet! Im really curious to understand how it happens."

      f.   About an hour later, McFARLAND emailed Victim-1 with the subject line "Offers" and stated "See attached. Will share Feb and March once finalized." Attached to the email was a spreadsheet containing a list of artists with the dates of purportedly confirmed bookings with Fyre Media from December 2016-January 2017, the booking amounts, and assorted information about the buyer for each booking (the "McFarland Fyre Media Booking Chart").

      g.   According to Victim-1, information about Fyre Media's revenue from bookings was important to Victim-1's decisions to invest in Fyre Media and Fyre Festival LLC.

### Victim-2

      h.   From in or about late 2016, up to and including April 2017, Victim-2 [BR] made a series of investments in Fyre Media and Fyre Festival LLC totaling approximately $500,000.

      i.   Victim-2 first met McFARLAND at Fyre Media's office in New York, New York in or about late 2016. During that

meeting, McFARLAND told Victim-2 that Fyre Media had artist bookings of up to $10,000,000 per month, of which Fyre Media received a ten percent cut. On or about January 29, 2017, McFARLAND provided the Fyre Media Income Statement to Victim-2.

j. According to Victim-2, information about Fyre Media's revenue from bookings was important to Victim-2's decisions to invest in Fyre Media and Fyre Festival LLC.

**Employee-1**

7. From speaking with a former Fyre Media employee ("Employee-1"), reviewing documents provided by Employee-1, and reviewing Company records, I have learned, in substance and in part, the following:

a. Employee-1 worked at Fyre Media from in or about May 2016, up to and including in or about May 2017. Employee-1 was responsible for overseeing talent relationships and bookings of artists for Fyre Media.

b. Employee-1 tracked all bookings from in or about May 2016, up to and including in or about April 2017, on a spreadsheet (the "Employee-1 Fyre Media Booking Chart"). In the course of Employee-1's work at Fyre Media, WILLIAM McFARLAND, the defendant, had access to the Employee-1 Fyre Media Booking Chart. Moreover, Employee-1 updated McFARLAND and other Fyre Media employees on the number of bookings and corresponding revenue at weekly Fyre Media meetings.

c. The Employee-1 Fyre Media Booking Chart shows that from in or about May 2016, up to and including in or about April 2017, <u>only 60 bookings</u> for performances and appearances were confirmed and paid. The fees paid to Fyre Media as a result of these 60 bookings totaled only <u>$57,443</u>.

d. During my interview of Employee-1, Employee-1 was shown a copy of the Fyre Media Income Statement, and reported never having seen it before. Employee-1 also could not identify any basis for the thousands of bookings and millions in revenue represented on the Fyre Media Income Statement.

8. Based on my comparison of the Fyre Media Income Statement with the Employee-1 Fyre Media Booking Chart, it appears that the Fyre Media Income Statement that McFARLAND provided to Victim-1 and Victim-2 overstates Fyre Media's revenue, profits and income. For example, Fyre Media Booking

5

Chart shows that the Fyre Media received $57,443 in total revenue from confirmed bookings for the entire time period from May 2016 to April 2017. However, the Fyre Media Income Statement represents that Fyre Media's income from bookings during only a subset of that timeframe (August 2016 to December 2016) ranged from hundreds of thousands of dollars to over $1 million per month.

9. Based on my review of the McFarland Fyre Media Booking Chart and the Employee-1 Fyre Media Booking Chart, it appears that the McFarland Fyre Media Booking Chart dramatically overstates the number and dollar amounts of Company bookings. For example, the Employee-1 Fyre Media Booking Chart shows 60 closed and paid bookings over a roughly year-long period. By contrast, the McFarland Fyre Media Booking Chart lists 4,637 confirmed bookings between December 1, 2016 and January 31, 2017. Similarly, in many instances, the total booking amounts reflected in a single day in the McFarland Fyre Media Booking Chart exceeded the total actual booking amounts over 15 months in the Employee-1 Fyre Media Booking Chart. Moreover, the Employee-1 Fyre Media Booking Chart does not show any artist being paid more than $45,000 for a single booking. By contrast, the McFarland Fyre Media Booking Chart shows several bookings exceeding $300,000 each, and numerous bookings for amounts greater than $100,000.

**MCFARLAND'S MISREPRESENTATIONS TO VICTIM-1 ABOUT HIS OWN ASSETS**

10. From speaking with Victim-1, who invested in Fyre Media and Fyre Festival LLC based in part upon misrepresentations by WILLIAM McFARLAND, the defendant, and reviewing documents provided by Victim-1, I have learned, in substance and in part, the following:

a. During the course of their discussions regarding Victim-1's potential investments in the Company, McFARLAND represented that he owned shares of a particular company's stock (the "Stock").

b. On April 24, 2017, McFARLAND and Victim-1 executed a revenue share agreement in which Victim-1 agreed to invest $200,000 in Fyre Festival LLC, with a 120% return, or 5% of the Fyre Festival revenue, whichever was greater, due on or before May 1, 2017. The Company guaranteed the 120% return on Victim-1's investment on or before May 1, 2017; and the return was guaranteed in entirety by McFARLAND's Stock. Attached to the agreement was a Scottrade statement provided by McFARLAND

6

that purported to show McFARLAND's ownership in the Stock (the "Fake Scottrade Statement").

        c.    The Fake Scottrade Statement purported to show that McFarland owned $2,565,079.18 in Stock.

        d.    Relying at least in part on McFARLAND's personal guarantee of Victim-1's investment, as reflected in the Fake Scottrade Statement, Victim-1 invested in Fyre Festival LLC on April 24, 2017.

        11.    Based upon my review of records obtained from Scottrade for an account belonging to WILLIAM McFARLAND, the defendant, I have learned that McFARLAND altered his Scottrade statement (the "Real Scottrade Statement") to show ownership of a greater value of the Stock than he actually had. The Real Scottrade Statement shows that McFARLAND's Stock is worth only $1,499.68. By contrast, the Fake Scottrade Statement purported to show that McFARLAND's Stock was worth $2,565,079.18.

        WHEREFORE, deponent prays that an arrest warrant be issued for the arrest of WILLIAM McFARLAND, the defendant, and that he be arrested and imprisoned or bailed, as the case may be.

BRANDON RACZ
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Sworn to before me this
30th day of June 2017

UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK